## Commonwealth v. DeBellis

*Ward F. Clark*, Assistant District Attorney, for Commonwealth.

*William L. Goldman*, for defendant.

BIESTER, P. J., July 10, 1959.—The above named defendant has been convicted by a jury on the first count of bill of indictment no. 46, November sessions, 1958, which charged him with violation of subsection (*b*) of article III, sec. 349, of The Insurance Company Law of May 17, 1921, P. L. 682, 40 PS §474, and bill of indictment no. 47, charging him with conspiracy with two persons, to wit, a Mr. and Mrs. Geiger, to cheat and defraud an insurance company.

Section 349 of The Insurance Company Law of 1921 provides as follows:

"(a) Any person who is knowingly concerned in, or who, for profit, gain, benefit, favor, or otherwise, makes any false oral statement, misrepresents, subtitutes persons or realty or goods, subscribes to or prepares, or helps to prepare, any fraudulent letter, document, application, affidavit, inventory, financial or other statement, or in any method or manner attempts to deceive, for the purpose of obtaining for himself, herself, or others, any of the classes of insurance provided for by this act; and (b) Any person knowingly concerned for profit, gain, benefit, favor, or otherwise, in preparing or forwarding any fraudulent application, affidavit, proof of loss, or claim, or attempting

to collect or collecting any wholly or partly fraudulent claim or money demand from any insurance company, association, or exchange, lawfully transacting business within this Commonwealth, whether any policy or agreement of insurance was lawfully procured or procured by fraud,—shall be guilty of a misdemeanor, . . ."

The evidence of the Commonwealth was to the effect that on May 5, 1958, defendant procured a home owners' insurance policy through an agent of the Washington County Insurance Company which, inter alia, provided coverage for personal property stolen from defendant's automobile providing the automobile had been properly locked and there were signs of forceful entry. At the same time defendant requested to be insured for $500 cash which he might have at any time in his possession. He was advised that such cash coverage was not available.

On June 29, 1958, he reported to the same agent that his car, while locked, had been broken into and personal property of considerable value stolen. His first discussion regarding the loss was with a detective of the Philadelphia police on June 29, 1958. At that time he furnished a list of the articles allegedly taken with a total value of $600, including a tire and wheel valued together at $80, which latter items were not included under the terms of the policy. When he presented his proof of loss form to the insurance company he listed items with a total value of $1,597.20. He was asked to procure evidence of the purchase of the various articles and, according to Mr. and Mrs. Geiger, testifying for the Commonwealth, he visited their home on July 6 or July 7, 1958, and asked them to furnish him with a false bill of sale, setting forth the purchase of two items, a pen and pencil set and an electric shaver, the former's price being fixed at $33 and the latter's price at $33.50. The receipt or bill of

sale was signed by Joseph Geiger and was dated May 17, 1958. No such items had been sold by either of the Geigers to defendant. Mr. Geiger was instructed by defendant, in the event he was questioned as to where he had obtained the items, to say that he had won them in a crap game.

Defendant, in relating the circumstances of the theft during the investigation and at the trial, stated that he was as of June 28, 1958, unemployed and had packed his car that morning with the items allegedly stolen with the intention of taking a vacation in Maine. He left his home in Fairless Hills, this county, and drove to a meat market in Philadelphia where he bought a supply of meat, intending, so he says, to have his brother, who lived in the vicinity of the meat market, deliver the meat to defendant's home. He then went into a neighborhood bar and drank intoxicating liquors, left that bar and went to a club where he consumed additional intoxicating liquor. He felt that he was too intoxicated to drive, at least this may be inferred from the testimony, and had a friend drive him to his home, arriving there at about 11:30 that night, first, however, procuring the meat from the car. The car was found broken into by the Philadelphia police and the investigation of the alleged crime and of the claim of loss followed.

He found it impossible to procure evidence of purchase of many of the items which he claimed to be stolen. Amongst these items were fishing rods and reels together valued at $166, which he said he had bought in Florida, a camera, valued at $200, which he said he bought "from a fellow up in Richmond", a pair of binoculars, valued at $75, which he bought from a man "from a ship", a diamond ring valued at $450, belonging to his wife, which he said he bought from a fellow worker. In addition to these items there are such articles listed in the proof of loss as a wallet

valued at $25, cash in the wallet in the amount of $225, five shirts valued at $54, two pairs of prescription glasses valued together at $95, six bottles of Haig and Haig Scotch valued at $54, and of course the pen and pencil set and electric razor. All of the items listed on the proof of loss form are said to have been new, with no reduction allowed for depreciation against the purchase price. It may be noted that when the loss was first revealed to the Philadelphia detective not only were many of the items referred to omitted, but the values fixed were at considerable variance. By way of illustration he valued the wallet at $5 and said it contained miscellaneous papers, no reference having been made to the cash. The diamond ring was evidently completely disregarded.

Mr. Geiger testified, inter alia, that defendant had admitted to him that defendant had himself broken into the car.

Defendant presented testimony that the pen and pencil set and electric razor had been gifts from his parents, producing the person who had sold the articles to his parents, and also his parents themselves to substantiate the gifts. Also testifying in his behalf were the man from whom the meat had been purchased, his drinking companion who brought him home, his wife and his son, the latter two testifying that they assisted defendant in packing the car. His wife and son, however, were able to substantiate but a few of the items supposedly in the automobile.

His witnesses were somewhat discredited. Mrs. De-Bellis had testified that she had given the ring to her husband to have the stone tightened shortly before he left on his trip, but an insurance investigator testified that Mrs. De Bellis had told him that she had given the ring to her husband in either May or June of 1958 in order that it might be pawned "to get money to pay some bills that he owed". Mr. deFranco, defend-

ant's drinking companion who had taken him home, stated in his testimony that he was with defendant at all times, but on cross-examination admitted that he had given an investigator a statement that defendant had left him in order to "check his car". Defendant stated that he had procured the bill of sale from the Geigers because his parents were on vacation; however, the parents testified that their vacation was during the last two weeks of July, whereas the Geigers had testified that defendant's visit to them for the purpose of procuring the false bill of sale was either on July 6 or 7.

A police officer testified that defendant had told him that the pen and pencil set was actually worth about $6.

From this testimony it appears clear that there was ample evidence to submit to the jury the question as to whether or not this defendant had submitted a fraudulent proof of loss.

Counsel for defendant contends that there is no separate crime defined in paragraph (*b*) of the applicable act of assembly. That is to say that the sections (*a*) and (*b*) define but one crime, which is composed of both the fraudulent obtaining of the insurance and the fraudulent submission of a proof of loss or other form. We find this contention to be completely void of merit. Although the act does not conform to the usual language contained in the Criminal Code in defining crimes, we have no doubt as to its meaning. The (*b*) section of the act provides, in effect, that anyone who prepares or forwards a fraudulent document or claim, he being knowingly concerned therein for profit, gain, benefit, favor or otherwise, *"whether any policy or agreement of insurance was lawfully procured or procured by fraud"* is guilty of a misdemeanor. The validity of any theory that in order to be guilty under the act in question, defendant

must both have obtained the insurance fraudulently and submitted a fraudulent claim completely escapes us.

The language of the bill of indictment is also criticized and we must agree that it is not as artfully drawn as it might have been. It may be noted, however, that although the language is not in precise conformity with the phraseology of the act of assembly involved, it is in substantial conformity therewith and fully informs defendant as to the nature of the charge. The form of the indictment was not made subject to criticism in the course of the trial except as to one minor item which was amended at the request of defendant's counsel. It therefore appears clear to the court that any minor or immaterial defects have been waived: Commonwealth v. Lingle, 120 Pa. Superior Ct. 434; Commonwealth ex rel. Ketter v. Day, 181 Pa. Superior Ct. 271; Commonwealth v. Heintz, 182 Pa. Superior Ct. 331.

The conspiracy indictment follows the language of section 302 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4302. Counsel does not attack the form of this indictment and the evidence would appear to support the existence of a conspiracy between the Geigers, especially Joseph Geiger, and defendant in the production of a false bill of sale designed to deceive the insurance company.

Trial counsel suggested definitions of the words "fraudulent" and "prejudice" somewhat at variance with the definition of the court but we find no error in the court's charge in this regard. The court told the jury that it was requisite that this be a fraudulent proof of loss of claim and that the common meaning of the word "fraudulent" is "dishonest" and further stated: "In the instant case it characterizes false representation of material matters made with the knowledge of their falsity at the time and made with the

purpose and intent to deceive". "Prejudice" was defined as meaning "to the harm, to the injury, to the disadvantage of someone". We believe that these definitions were in conformity with the law.

*Order*

And now, to wit, July 10, 1959, the motion for a new trial is overruled, denied and refused. Defendant is directed to appear before this court on Friday, August 21, 1959, at 10 a.m., in order that sentence may be imposed.